# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>the Facebook user ID # 100024725465615, fully<br>described in Attachment A. | )<br>)<br>)<br>)<br>)<br>) |

Case No.  22-933M(NJ)

**Matter No.: 2022R00268**

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   August 17, 2022 _____   *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____   Honorable Nancy Joseph _____   .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     8/3/2022 @ 10:14 p.m. _____

*Judge's signature*

City and state:     Milwaukee, WI _____          Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name(s) of any person(s) seized: |
|---|
| |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID #
100024725465615 that is stored at premises owned, maintained, controlled, or operated by
Facebook Inc., a company headquartered in Menlo Park, California.

2

## ATTACHMENT B

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including Facebook user ID # 100024725465615**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles and other such items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests;

comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)   All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)   All "check ins" and other location information;

(g)   All IP logs, including all records of the IP addresses that logged into the account;

(h)   All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)   All information about the Facebook pages that the account is or was a "fan" of;

(j)   All past and present lists of friends created by the account;

(k)   All records of Facebook searches performed by the account;

(l)   All information about the user's access and use of Facebook Marketplace;

(m)   The types of service utilized by the user;

(n)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, or instrumentalities of, or contraband from, violations of Title 19, United States Code, 922, Title 21, United States Code, Sections 841 involving WATSON-BOWERS since January 1, 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The possession and/or sale of illegal narcotics;

(b) The possession of firearms;

(c) Evidence of straw purchasing firearms and illegal firearms trafficking;

(d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(g) The identity of the person(s) who communicated with the user ID about matters relating to the sale or purchase of illegal narcotics, including records that help reveal their whereabouts.

## III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized

3

specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   22-933M(NJ) |
| the Facebook user ID # 100024725465615, fully described in Attachment A. | ) ) ) | **Matter No.: 2022R00268** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A); § 922(a)(6)/924(a)(1)(A); and § 922(d)(1) | Engaging in the Business Without a License (Firearms); False Statement During the Purchase of a Firearm; and Sale/Transfer of a Firearm to a Prohibited Person |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Brendan Mulvey, ATF
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means).*

Date:   8/3/2022

_____
*Judge's signature*

City and state:   Milwaukee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID 100024725465615
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK, INC.

Misc. No. _____

**Filed Under Seal**

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Brendan Mulvey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook user ID that is stored at premises owned,

maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company

headquartered in Menlo Park, California.  The information to be searched is described in the

following paragraphs and in Attachment A.  This affidavit is made in support of an application for

a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require

Facebook to disclose to the government records and other information in its possession, further

described in Section I of Attachment B, pertaining to the subscriber or customer associated with

the user ID.  Upon receipt of the information described in Section I of Attachment B, government-

authorized persons will review that information to locate the information described in Section II

of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and

Explosives (hereinafter "ATF"). As such, I am "an investigator or officer charged by the Attorney

General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws

of the United States," within the meaning of Section 3051(a) of Title 18, United States Code; that

is, an officer of the United States who is empowered by law to conduct investigations of, execute warrants and to make arrests for offenses against the United States and offenses enumerated in United States Code Title 18 and Title 21. I have been employed with the ATF since January 2015, and am currently assigned to the Milwaukee Field Office, under the Chicago Field Division. I completed Criminal Investigative Training and Special Agent Basic Training at the Federal Law Enforcement Training Center. I have received training on in connection with, and conducted investigations of violations of the National Firearms Act, Gun Control Act, and Title 18, United States Code, Sections 922(g), 924(c) and others. I have also received training and conducted investigations involving illicit drugs and the distribution of illicit drugs in violation of Title 21, United States Code, Sections 841, 843, 846 and others.

3.     Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving firearms, I know that individuals involved with firearms trafficking and illicit drug use commonly use the social media platform Facebook to facilitate their firearm trafficking/criminal activities. Like most everyone else in this day and age, firearm traffickers and illicit drug users typically have a Facebook profile and are able to access it via their computer or cellular telephone. Firearm traffickers and illicit drug users commonly maintain a Facebook profile, and sometimes allow other firearm trafficking and/or illicit drug using associates to use their profile, to conduct criminal activity and/or firearm trafficking business.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 United States Code 922 as well as Title 21 USC 841, have been committed by Robert WATSON-BOWERS JR ("WATSON-BOWERS"), and others, known and unknown, as explained below.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, and no offender is known to have, or have had, residence within any United States district.  *See* 18 U.S.C. § 3238.

## PROBABLE CAUSE

1.      In July 2022, ATF was made aware of a fatal shooting that occurred at 1134 N. 20th St, Apartment 101, in the city and county of Milwaukee, ("the Incident Location" herein) which resulted in the death of a three-year-old victim.

2.     Investigators from the Milwaukee Police Department (MPD) responded to the scene and located the victim laying face-up on the living room floor with apparent gunshot wound to the head. Also upon arrival, as emergency first aid was being rendered to the victim, additional responding officers began conducting a protective sweep for the presence of any threats that may be present on scene. While conducting a sweep of the basement door located immediately adjacent

3

to the incident location, MPD Officers located a red and black Nike duffle bag concealed behind the basement door containing a [1] Kimber, model Aegis Elite Custom, .45 caliber pistol, bearing serial number K674765 ("the Kimber" herein), a [2] Glock, model 19X, 9mm caliber pistol, bearing serial number BUYX063 ("the Glock 19X" herein), and a [3] Glock, model 17 Gen. 4, 9mm caliber pistol, bearing serial number SCY886 ("the Glock 17" herein), a brown in color magazine containing ten [10] rounds of ammunition, as well as various packages of suspected marijuana. While rendering the weapons safe, MPD Officer observed the Glock 19X to have a spent cartridge casing located inside the chamber which was not properly ejected from the port. It should also be noted that no casings were located inside the residence where the shooting occurred. Therefore, your affiant concludes that the Glock 19X was the firearm utilized in the fatal shooting.

3.      ATF E-Traces were subsequently conducted on all of the recovered firearms. In doing so, ATF identified the Glock 19X to have been originally purchased by WATSON-BOWERS from Federal Firearms Licensee (FFL) Select Fire Weaponry, located at 2325 Parklawn Dr, Suite B, Waukesha WI 53186, on June 28, 2022. Your affiant observed the firearm's time-to-crime/time-to-recovery (TTC/TTR) to be 3-days. Furthermore, the Glock 17 was also identified to have been purchased by WATSON-BOWERS from Select Fire Weaponry on May 28, 2022. Your affiant observed the firearm's TTC/TTR to be 34-days.

4.      MPD Investigators then conducted an on-scene interview of the victim's mother Shantia JONES (DOB: XX/XX/XXXX) regarding the incident. JONES informed MPD that she, along with her live-in boyfriend Raheem Deon MOORE (DOB: XX/XX/XXXX), her sister XXXXX WALKER (DOB: XX/XX/XXXX), and her two children to include the victim had been at the apartment for the past two [2] days. JONES stated that there are several firearms inside the residence. JONES stated that she went to sleep at approximately 2300 hours the night before on

4

June 30, 2022. JONES stated that her son (the victim) was already asleep in his bedroom, along with his brother, and WALKER at the time she went to sleep. JONES stated that MOORE was still awake in the living room watching television when she went to bed. JONES stated she was awoken by the sound of a gunshot at approximately 0430 hours and ran out of her room and located the victim on the floor in the living room near where MOORE was still sleeping on the couch. JONES stated that MOORE then departed the scene prior to police arrival because he was a convicted felon. A criminal history check of MOORE confirmed his status as a convicted felon based on his conviction of 2nd Degree Reckless Homicide – Party to, which was filed in Milwaukee County on October 13, 2008.

5.      MPD Investigators then questioned JONES as to who the owner of the Nike duffle bag was, to which she explained the bag belonged to MOORE, and that she had previously seen him with the bag on several occasions. JONES also informed MPD that she had an unspecified .380 caliber pistol stowed behind her television in her bedroom that she observed prior to and immediately after the shooting, however, the pistol had since gone missing.

6.      Investigators then obtained written consent from JONES to conduct a search of the residence.

7.      Investigators subsequently recovered multiple items of evidentiary value inside the Southeast bedroom of the residence. More specifically, located in the top dresser drawer inside the Southeast closet of the bedroom along the East wall was a wallet containing two [2] Wisconsin identification cards for MOORE. Also located inside the same drawer was a Glock magazine containing one [1] round of ammunition, one [1] box containing eighteen [18] rounds of .40 caliber ammunition, a plastic sandwich bag containing eighteen [18] rounds of 9mm caliber ammunition, one [1] box containing thirty-one [31] rounds of 5.7x28mm caliber ammunition, one [1] round of

5

.223 caliber ammunition, as well as US currency. Also located inside the Southeast closet on top of the shelf was an empty brown in color, unknown brand, gun box containing a purchase receipt with the name WATSON-BOWERS for the purchase of a Glock, model 21 Gen. 3, bearing serial number BFFH772 ("the Glock 21" herein). The receipt was observed to be affixed to a copy of a Wisconsin Department of Justice Firearms Dealer Notification (Handgun Transfers) Form completed by WATSON-BOWERS on June 24, 2022. Your affiant noted the Glock 21 to have been purchased just seven [7] days prior to the receipt/Wisconsin Handgun Form being recovered by law enforcement on the date of the incident. Also recovered from beneath the bed inside the Northeast bedroom was an empty black in color Glock brand gun box with an identified serial number of BUPB587. Your affiant identified the box to belong to a Glock, model 19, 9mm caliber pistol, bearing the aforementioned serial number BUPB587, which was purchased by WATSON-BOWERS on May 31, 2022, from Select Fire Weaponry, located at 2325 Parklawn Dr, Suite B, Waukesha WI 53186. Your affiant also observed the purchase to prompt a Multiple Sale Report as WATSON-BOWERS had purchased the Glock 17 within five [5] business days of the May 31, 2022, purchase. Your affiant is aware that the Gun Control Act of 1968 requires FFL's to report to the ATF when there is a sale of multiple handguns to the same purchaser during a single transaction, or within five [5] consecutive business days of each other. These types of transactions are commonly referred to as "multiple sales."

8.     To date, ATF has identified WATSON-BOWERS to have engaged in four [4] separate transactions, in which a total of four [4] firearms were purchased. Your affiant observed all purchases to have occurred at FFL Select Fire Weaponry, which is located in the Eastern Judicial District of Wisconsin. Your affiant noted all four [4] firearms purchased by WATSON-BOWERS to be Glock brand pistols, three [3] being of similar model and caliber. Your affiant is

6

aware that multiple purchases of the same/similar type/model/caliber firearm in a short period of time is often indicative of firearms trafficking as opposed to firearms collecting. Furthermore, ATF has reason to believe that WATSON-BOWERS has engaged in firearms straw purchasing on behalf of MOORE.

9.     As part of this investigation, your affiant obtained ATF Form 4473 paperwork completed by WATSON-BOWERS during all identified firearm purchases from Select Fire Weaponry. Your affiant reviewed the documents and observed WATSON-BOWERS to provide a residential address of 3371 N. 5th St, Milwaukee, WI 53212, in Section B Question 10 on the form during all transactions. Your affiant also observed WATSON-BOWERS to mark "Yes" when answering question 21. a. located in Section B on each form which reads:

> "Are you the actual transferee/buyer of the firearm(s) listed on this form and any continuation sheet(s) (ATF Form 5300.9A)? **Warning: You are not the actual transferee/buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual transferee/buyer, the licensee cannot transfer the firearm(s) to you.** Exception: If you are only picking up a repaired firearm(s) for another person, you are not required to answer question 21. a. and may proceed to question 21. b."

Your affiant also observed WATSON-BOWERS to mark "No" when answering question 21.e., which reads:

> "Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? **Warning**: The use or possession of

7

marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside."

10.     Your affiant also observed WATSON-BOWERS to provide his signature in box 22. on each form, certifying that the information provided in Section B of the form is true. Further, by signing, WATSON-BOWERS understood it would be a violation of Federal law to answer "Yes" to question 21. a. if he was not in fact the actual transferee/buyer of the firearm, and that he would be committing a felony violation by misrepresenting himself as the actual purchaser. WATSON-BOWERS also certified that he understood, "that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a federal firearms license is a violation of Federal law."

11.     Also, as part of this investigation, your affiant obtained copies of the Wisconsin Department of Justice Firearms Dealer Notification Form's completed by WATSON-BOWERS during all identified firearm purchases. Your affiant is aware that FFL's are required by Wisconsin state law to have customers complete this form prior to engaging in the sale/transfer of a handgun. Upon reviewing the forms, your affiant observed WATSON-BOWERS to write "Yes" next to question 16. a. on the form which reads:

> "Are you the actual purchaser of the firearm? You are the actual purchaser
> if you are not purchasing the firearm at the request of, or on behalf of, any other
> person or are not purchasing the firearm with the purpose or intent of reselling the
> firearm to any other person."

12.      Furthermore, your affiant observed WATSON-BOWERS to write "No" next to question 16. b. on each form which reads:

"Are you purchasing the firearm with the purpose or intent to transfer the firearm to a person who is prohibited from possessing a firearm under state or federal law? WARNING: TRANSFER TO MINORS, FELONS, AND PROHIBITED PERSONS. It is illegal for anyone to provide or assist in providing any firearm to a minor, except under conditions as set forth in the Wisconsin statutes, and under any circumstances to provide or assist in providing any firearm to a convicted felon or any other person prohibited by law from possessing a firearm under s. 941.29. Criminal prosecution may result in up to a $25,000 fine and up to 10 years imprisonment under s. 941.2905."

13.     Your affiant also observed WATSON-BOWERS to provide the telephone number (414) 484-0342 as his point of contact alongside his signature at the bottom of Section 1 on each form. Upon providing his signature, WATSON-BOWERS certified that the information provided on the form was true. As part of this investigation, your affiant conducted a records check of the aforementioned telephone number for unofficial subscriber information using law enforcement databases and observed WATSON-BOWERS to list as the likely user of the assigned number.

14.     In obtaining these documents, Select Fire Weaponry also provided ATF with a store purchase policy statement which was also signed by WATSON-BOWERS at the time of firearm purchase. FFL XXXX XXXXXX of Select Fire Weaponry informed your affiant that this is a new practice implemented by the store and that the store began requiring the completion of the form in June 2022 prior to engaging in the transfer of a firearm. FFL XXXXXX stated that WATSON BOWERS completed this form during both the June 24, 2022, and the June 28, 2022, firearm purchases. The policy lists a series of terms and conditions that a purchaser must agree to prior to Select Fire Weaponry processing a transaction. Upon reading the form, your affiant

9

observed Paragraph 2 to stipulate the that the purchaser must provide an accurate place of residence and that the address provided must also be reflected on a valid state issued identification card, or other state issued legal document. Failure to provide physical proof of current residence/address would result in Select Fire Weaponry not facilitating the sale of a firearm. Your affiant also observed Paragraph 3 to warn the purchaser against engaging in straw purchasing activity. Specifically, Paragraph 3 states the following:

> **"ANY ATTEMPT TO STRAW PURCHASE A GUN (BUYING A GUN FOR SOMEONE ELSE) WILL BE REPORTED TO FEDERAL, STATE, AND/OR LOCAL AUTHORITIES. IF WE SUSPECT AT ANY POINT THAT THIS IS OCCURRING, WE WILL IMMEDIATELY CANCEL THE TRANSACTION, REPORT TO THE AUTHORITIES MENTIONED ABOVE, AND ANY PAYMENT WILL NOT BE REFUNDED."**

15.     The policy also warned the purchaser against providing any false or inaccurate information on the ATF Form 4473 and/or State of Wisconsin Handgun Form, and that doing so may result in Federal/State/Local prosecution. WATSON-BOWERS then provided his initials agreeing that the information provided on the forms were accurate.

16.     The policy also required the purchaser to agree to the terms and conditions detailed on the policy and to proceed with a non-refundable payment. WATSON-BOWERS then provided his initials, agreeing to said terms. WATSON-BOWERS also provided his name, signature, and phone number at the bottom of the form, certifying that he read and accepted the store purchase policy.

17.     Lastly, in acquiring these documents, your affiant also obtained copies of the bills of sale for all purchases made by WATSON-BOWERS from Select Fire Weaponry. In doing so, your affiant observed WATSON-BOWERS to have expended a total of $2,361.18 USC (tax

10

included), in mostly cash payments, in firearms purchases. Your affiant also noted WATSON-BOWERS to have engaged in all four [4] transactions within a one [1] month timeframe, with the first identified purchase occurring on May 28, 2022, and the last on June 28, 2022.

18.    In obtaining these records, your affiant again spoke with FFL XXXXXX of Select Fire Weaponry. FFL XXXXXX informed your affiant that the store retained video footage that recorded WATSON-BOWERS visits during all identified purchases. FFL XXXXXX also informed your affiant that on each occasion, WATSON-BOWERS arrived at the store driving a silver in color Nissan sedan, with unknown registration. Your affiant then traveled to Select Fire Weaponry and reviewed the footage with FFL XXXXXX. Your affiant observed the vehicle operated by WATSON-BOWERS during his firearm purchases and believed it to be a silver in color Nissan Altima.

19.    On or about July 20, 2022, your affiant engaged in a surveillance operation at the Target Residence. During the operation, your affiant observed a black, male, adult, whom he believed to be WATSON-BOWERS based on reviewing his Wisconsin state issued driver's license photo, exit the residence and enter the driver's seat of a silver in color Nissan Altima bearing WI registration plate AEC-1537, which was parked in front of the Target Residence on the east side of the street facing northbound. Your affiant observed the vehicle to match that as the one captured by surveillance footage from Select Fire Weaponry on the dates of WATSON-BOWERS firearm purchases. Your affiant then observed the vehicle depart travelling northbound on N. 5th St. before disappearing from view.

20.    Also, on or about July 20, 2022, your affiant learned of a recorded jail call made by JONES to her grandmother, at telephone number 414-722-4627, on July 3, 2022 at approximately 1836hrs. At approximately four (4) minutes and eight (8) seconds into the recorded

11

call JONES states, "He (referring to MOORE) put a whole bunch of stuff in a bag and left it in the basement and they putting all of that on me." JONES' grandmother asks her if law enforcement asked JONES if it was her bag or if they were just putting it on her. JONES states she told law enforcement the bag belonged to MOORE and that it was MOORE'S firearm. At approximately five (5) minutes and twenty-two (22) seconds into the recorded call JONES states, "I told them that grandma, right there when they found the bag at the house and I was sitting in the police car they said well who's bag is this? I said that's his (referring to MOORE) bag. They said do you know what's in it? I said…I said no I don't know what's in it. They asked me about the gun. I said it ain't his gun but its his cousins gun, but it's in his possession. I said it's in his cousin's…momma they even found the receipt with his cousin's name (referring to WATSON-BOWERS) from buying the gun." At approximately nine (9) minutes and forty (40) seconds into the recorded call JONES states, "Cause I already told them. I told them, that you know it (referring to the firearm) was in his cousin's name and it's his cousin's gun but he had it so…(inaudible)…sleeping on the couch with it next to him (referring to MOORE)."

21.    Also, as part of this investigation, investigators obtained and served a Federal Grand Jury Subpoena to T-Mobile for records pertaining to the suspect telephone number (414) 484-0342. Upon obtaining these records, ATF learned the subscriber for the suspect telephone number to be "Robert Watson Bowers." The account number was observed listed as 972438522, and shows it as being active since January 26, 2021. The account is billed to WATSON-BOWERS and lists his date of birth as being July 4, 1997, and social security number (SSN) as 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. Lastly, it lists WATSON BOWERS cellular telephone to bear IMEI # 351793393021162.

12

22.     Through the analysis of WATSON-BOWERS' toll records, your affiant identified telephone number 414-554-8734 as being associated to MOORE and telephone number 414-469-0993 as being associated to JONES. Both telephone numbers were observed to be in communication with WATSON-BOWERS' telephone number before and after each firearm purchase. It is important to note, JONES utilized telephone number 414-676-4867 to call E911 when she reported the July 1, 2022 shooting incident. Telephone number 414-676-4867 was found to list to JONES when queried through law enforcement databases. Your affiant knows MPD Detectives, who investigated the July 1, 2022 shooting incident, were able to review JONES' cellular telephone through consent to search, which was provided by JONES. Telephone number 414-676-4867 does not show up in WATSON-BOWERS toll records during the requested dates. Furthermore, through this investigation, your affiant has learned MOORE maintained a minimum of two (2) cellular telephones. One (1) of which was recovered by MPD at the scene of the shooting incident. Through recorded jail call(s) made by MOORE, your affiant learned MOORE possessed a second cellular telephone, which MOORE ended up damaging/destroying sometime between fleeing and turning himself into law enforcement. Based on training, experience, and information learned through this investigation, your affiant believes MOORE likely possessed and maintained telephone numbers 414-554-8734 and 414-469-0993.

23.     On or about July 25, 2022, your affiant obtained a federal search warrant for the residence and associated vehicle(s) of WATSON-BOWERS, which was authorized by the Honorable Stephen C. Dries, United States Magistrate Judge. ATF subsequently executed the search warrant the following day, on July 26, 2022.

24.     At the time of execution, ATF Special Agents and assisting MPD personnel surrounded the residence and Special Agents positioned outside the front entry door began a

13

"knock and announce" procedure, in which they articulated their presence as law enforcement and that they possessed a search warrant. Eventually, the door was opened by a black female adult, later identified as XXXX XXXXXXX (DOB: XX/XX/XXXX), who was then escorted by law enforcement out of the residence towards N. 5th St. Moments later, a black male adult, whom your affiant recognized to be WATSON-BOWERS, emerged from the top of the stairwell from the part of the residence where the bedrooms are located. WATSON-BOWERS was then detained and escorted outside the residence away from ATF entry unit(s). The ATF entry unit(s) then performed a tactical sweep of the residence for any remaining known and/or unknown co-conspirators in an attempt to make the residence safe and clear. While doing so, upon entering the South bedroom, located on the second floor, agents came across a room filled with smoke which smelled of burnt marijuana.

25.     Once the residence was deemed clear of additional occupants, your affiant met with WATSON-BOWERS who was standing outside of the residence near N. 5th St. WATSON-BOWERS then confirmed with your affiant that 3371 N. 5th St. was his primary residence, and that he sleeps on the couch located in the first floor living room area. A search of the residence resulted in the recovery of several items of pertinent value to the investigation. Specifically, agents recovered the Glock 21; which, as described above in paragraph 7, MPD had recovered a non-descript gun box for containing the sales receipt with WATSON-BOWERS name on it from their July 1, 2022 shooting investigation. Furthermore, agents also observed evidence of the illegal consumption of marijuana, i.e. burnt marijuana cigarillos and marijuana packaging.

26.     Prior to leaving the residence agents got a statement from the black female adult, identified as XXXX XXXXXXX (DOB: XX/XX/XXXX), who had originally opened the door of

14

the residence for agents. XXXX XXXXXXX stated WATSON-BOWERS smokes marijuana daily and has been doing so for several years.

27.    Based on this investigation and other complex investigations, I know illegal drug users as well firearm traffickers utilize multiple mechanisms to facilitate criminal activity, as well as attempt to thwart law enforcement efforts by constantly changing communication devices and modes of transportation. However, Facebook and its subsidiary companies implement a variety of algorithms and technology to discourage and in some cases remove or block, multiple Facebook accounts by a single user. Consequently, the investigation has yielded no information that WATSON-BOWERS operates any Facebook but the TARGET ACCOUNT, and as such, I believe an abundant amount of evidence regarding criminal activity will be located on the TARGET ACCOUNT.

28.    In sum, I believe WATSON-BOWERS utilizes the TARGET ACCOUNT to document his illegal possession of firearms, assist with the trafficking of firearms and possession, use, and/or trafficking of illegal narcotics. Based on the aforementioned facts, I believe there is probable cause to believe that WATSON-BOWERS is utilizing the TARGET ACCOUNT to illegally possess firearms, illegally traffic firearms and illegally possess narcotics, in violation of Title 18 USC 922 as well as Title 21 USC 841.

29.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the

15

user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account. Facebook identifies unique Facebook accounts by a user's email address, the user ID number, or the username associated with a Facebook profile.

31.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34.     Facebook allows users to upload photos and videos, which may include any metadata such as a location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

35.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account.

17

Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

36.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

38.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

41.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

18

42. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

45. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

46. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on

19

Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

47. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. From my training, experience, and investigation, I know that a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook

20

account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Finally, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information

21

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

## **CONCLUSION**

51.     Based on the forgoing, I request that the Court issue the proposed search warrant.

52.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

53.     Because the warrant will be served on Facebook who will then compile the requested records and information at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

This warrant applies to information associated with the Facebook user ID #

100024725465615 that is stored at premises owned, maintained, controlled, or operated by

Facebook Inc., a company headquartered in Menlo Park, California.

2

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized and Procedures**
**to Facilitate Execution of the Warrant**

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)      All contact and personal identifying information, including Facebook user ID # 100024725465615**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)      All profile information; News Feed information; status updates; links to videos, photographs, articles and other such items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests;

comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f)     All "check ins" and other location information;

(g)     All IP logs, including all records of the IP addresses that logged into the account;

(h)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i)     All information about the Facebook pages that the account is or was a "fan" of;

(j)     All past and present lists of friends created by the account;

(k)     All records of Facebook searches performed by the account;

(l)     All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, or instrumentalities of, or contraband from, violations of Title 19, United States Code, 922, Title 21, United States Code, Sections 841 involving WATSON-BOWERS since January 1, 2022, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The possession and/or sale of illegal narcotics;

(b) The possession of firearms;

(c) Evidence of straw purchasing firearms and illegal firearms trafficking;

(d) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(e) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(f) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(g) The identity of the person(s) who communicated with the user ID about matters relating to the sale or purchase of illegal narcotics, including records that help reveal their whereabouts.

## III.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by Facebook and determine which information is within the scope of the information to be seized

3

specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from Facebook that does not fall within the scope of Section II and will not further review the information absent an order of the Court.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS
## RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct. I am employed by Facebook, and my official

title is _____. I am a custodian of records for Facebook. I state

that each of the records attached hereto is the original record or a true duplicate of the original

record in the custody of Facebook, and that I am the custodian of the attached records consisting

of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of

the matter set forth, by, or from information transmitted by, a person with knowledge of those

matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity

of Facebook; and

c.      such records were made by Facebook as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.


_____        _____

Date                                                      Signature